# United States Court of Appeals
# for the Federal Circuit

---

**JEFFREY MEMMER, GILBERT EFFINGER, LARRY GOEBEL, SUSAN GOEBEL, OWEN HALPENY, JOSEPH JENKINS, MICHAEL MARTIN, RITA MARTIN, MCDONALD FAMILY FARMS OF EVANSVILLE, INC., REIBEL FARMS, INC., JAMES SCHMIDT, ROBIN SCHMIDT,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant*

---

2021-2133, 2021-2220

---

Appeals from the United States Court of Federal Claims in No. 1:14-cv-00135-MMS, Senior Judge Margaret M. Sweeney.

---

Decided: September 28, 2022

---

THOMAS SCOTT STEWART, Stewart Wald & McCulley, LLC, Kansas City, MO, argued for plaintiffs-appellants. Also represented by ELIZABETH MCCULLEY; STEVEN WALD, St. Louis, MO.

DANIEL HALAINEN, Environment and Natural Resources Division, United States Department of Justice,

Washington, DC, argued for defendant-cross-appellant. Also represented by TODD KIM.

MARK F. HEARNE, II, True North Law Group, LLC, St. Louis, MO, for amici curiae Cato Institute, James W. Ely, Jr., National Association of Reversionary Property Owners, Owners' Counsel of America, Reason Foundation, Southeastern Legal Foundation. Also represented by STEPHEN S. DAVIS.

―――――――――

Before LOURIE, SCHALL, and REYNA, *Circuit Judges.*

SCHALL, *Circuit Judge.*

Jeffrey Memmer and the eleven other plaintiffs-appellants in this case (collectively, "Appellants" or "landowners") own property in the state of Indiana. In February of 2014, they brought suit in the United States Court of Federal Claims, seeking compensation for an alleged taking arising from the operation of § 8(d) of the National Trails System Act Amendments of 1983 ("Trails Act"), 16 U.S.C. § 1247(d).[1] Appellants claimed that actions taken by the government on April 8, 2011, had permanently taken their property. According to Appellants, the taking arose out of the abandonment by Indiana Southwestern Railway Company ("Indiana Southwestern") of railway easements in Indiana in which Appellants had reversionary interests. Following a trial, the Court of Federal Claims found that

―――――――――

[1] The original complaint was filed by Mr. Memmer for himself and as representative of a class of similarly situated individuals. Complaint, *Memmer v. United States*, No. 1:14-cv-00135-MMS (Fed. Cl. Feb. 18, 2014), ECF No. 1. In January of 2015, Mr. Memmer, joined by the other named Appellants, filed an amended complaint. Amended Complaint, *Memmer v. United States*, No. 1:14-cv-00135-MMS (Fed. Cl. Jan. 9, 2015), ECF No. 19.

the United States had taken Appellants' property. The court determined, however, that the taking lasted only from May 23, 2011, to January 7, 2014. *Memmer v. United States*, 150 Fed. Cl. 706, 761 (Nov. 2, 2020) ("*Memmer I*"). Following the court's decision, and after the parties stipulated to compensation and interest, the court entered judgment in favor of Appellants. Judgment, *Memmer v. United States*, No. 1:14-cv-00135-MMS (Fed. Cl. June 7, 2021), ECF No. 198, J.A. 77.

Appellants have appealed the ruling of the Court of Federal Claims that the taking by the United States lasted only from May 23, 2011, to January 7, 2014. For its part, the government has cross-appealed. It contends that the Court of Federal Claims erred in holding that Appellants' property was taken. In the alternative, the government argues that, if there was a taking, it lasted only from May 23, 2011, to November 8, 2013.

For the reasons set forth below, we agree with the Court of Federal Claims that Appellants' property was temporarily taken under the Trails Act. We agree with the government, however, that the taking lasted only from May 23, 2011, to November 8, 2013. Accordingly, we affirm-in-part and vacate-in-part. The case is remanded to the Court of Federal Claims for a determination as to the compensation and interest to which Appellants are entitled as a result of the taking of their property having ended on November 8, 2013, rather than on January 7, 2014.

BACKGROUND

I

A rail carrier that intends to abandon or discontinue a rail line must either file an application with, or seek exemption from, the Surface Transportation Board ("STB" or "Board"). The STB has authority to regulate the construction, operation, and abandonment of most rail lines in the United States. 49 U.S.C. §§ 10903, 10502; 49 C.F.R.

§§ 1152.20–1152.22, 1152.50; *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). At the same time, Congress has determined it beneficial to preserve established railroad rights-of-way and to create recreational trails. Accordingly, § 8(d) of the Trails Act, 16 U.S.C. § 1247(d), provides a mechanism for a rail carrier that intends to abandon or discontinue a rail line to instead negotiate an agreement with a locality or a private entity trail sponsor to convert the railroad's right-of-way into a recreational trail.[2]

If a rail carrier has sought an abandonment exemption and agrees to negotiate an agreement with a trail sponsor, the STB will issue a Notice of Interim Trail Use or Abandonment ("NITU"). The NITU provides for a negotiation period during which the railroad can "discontinue service" on the rail line and "salvage track and materials." 49 C.F.R. § 1152.29(d)(1) (2012) (providing a negotiation period of 180 days); *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 7 & n.5 (1990) (discussing the 180-day negotiation period following the issuance of a NITU by the Interstate Commerce Commission, the predecessor to the STB).[3]

---

[2] An alternate means of preventing the abandonment of a rail line is through another party's offer to subsidize the rail line that is the subject of an abandonment application. This is referred to as an Offer of Financial Assistance, or "OFA." *See* 49 U.S.C. § 10904.

[3] If a railroad that has applied for abandonment without seeking an exemption agrees to negotiate a trail-use agreement, the railroad may apply to the STB for a Certificate of Interim Trail Use or Abandonment ("CITU"). 49 C.F.R. § 1152.29(c)(1) (2012). Section 1552.29 of Title 49 has changed and currently provides that a railroad may fully abandon the line if no interim trail-use agreement is reached within one year of the issuance of the NITU or CITU. *See* 49 C.F.R. § 1552.29(c),(d) (2020).

After the negotiation period, if no agreement is reached, the railroad may abandon the line and file a notice of consummation of abandonment with the Board. 49 C.F.R. § 1152.29(d)(1), (e)(2). If an agreement is reached, trail use of the right-of-way is authorized and abandonment by the railroad is blocked indefinitely, subject to restoration of the right-of-way for railroad purposes. *Castillo v. United States*, 952 F.3d 1311, 1315 (Fed. Cir. 2020); *see also* 16 U.S.C. § 1247(d). Because the right-of-way may be restored for railroad purposes, the process contemplated by the Trails Act is referred to as "railbanking." *See Caldwell*, 391 F.3d at 1229.

Where the railroad held an easement to the underlying property, the conversion of the right-of-way to a recreational trail, and thus the implementation of a new easement, can form the basis for a physical takings claim under the Fifth Amendment to the Constitution. *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (en banc) ("*Presault II*"). Such a taking occurs when "state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Caldwell*, 391 F.3d at 1233. We have explained that the taking begins upon the issuance of the NITU, "the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Id.* at 1233–34, 1236; *see also Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006).

In *Ladd v. United States*, 630 F.3d 1015, 1023–24 (Fed. Cir. 2010), we held that where no trail-use agreement is reached, but the NITU compels the railroad to delay its abandonment, the issuance of a NITU can effect a temporary physical taking. In *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020) ("*Caquelin III*"), we clarified and explained whether the issuance of a NITU alone can trigger a taking. The *Caquelin III* court clarified the legal standard for "the timing of a NITU-based taking" and the

application of general causation principles under *Caldwell*, *Barclay*, and *Ladd*. 959 F.3d at 1370–71.  The court explained that, because a railroad's easement would remain in place absent abandonment by the railroad, there could be no taking until the time as of which, had there been no NITU, the railroad would have abandoned the rail line.  *See id.* at 1371–72.  In other words, "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU."  *Id.* at 1363.  "[I]n such a case, the NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU."  *Id.*

II

On October 25, 2010, Indiana Southwestern submitted a notice of exemption from abandonment proceedings, stating that it would consummate abandonment of its rail lines on or after January 15, 2011.  *Memmer I*, 150 Fed. Cl. at 748; J.A. 253–54, 1253–57, 1358–61.  In response, on November 12, 2010, the STB published a notice stating that, absent third party intervention, the exemption would be effective, and thus, Indiana Southwestern could abandon the lines, on December 14, 2010.[4]  75 Fed. Reg. 69,520 (Nov. 12, 2010).  The STB's notice indicated that the deadline for railbanking requests and OFAs was November 22, 2010.  *Id.*  Pursuant to 49 C.F.R. § 1152.29(e)(2), Indiana Southwestern was given one year from the STB's notice, until November 12, 2011, to file a notice of consummation of abandonment, if it chose to do so.

A few days after the STB's notice was published, the Indiana Trails Fund, Inc. ("Trails Fund") submitted a request for the Board to issue a NITU for the rail corridor to

---

4    We hereafter sometimes refer to Indiana Southwestern's rail lines collectively as the "rail line" or "line."

permit negotiations about railbanking if Indiana Southwestern agreed. J.A. 254. The Board also received notice from the Town of Poseyville, Indiana of its intent to file an OFA.

On November 23, 2010, Indiana Southwestern advised that it was "willing to negotiate interim trail use/rail banking with . . . the Indiana Trails Fund, Inc." Suppl. App. 1.[5] The Town of Poseyville's OFA, however, took priority over the railbanking request, and there were several months of proceedings over the town's offer. *Memmer I*, 150 Fed. Cl. at 733–34. Ultimately, the Poseyville offer fell through.

Thereafter, with the railroad's consent, on April 8, 2011, the Board issued a NITU that became effective May 23, 2011. *Id.* at 734, 751; J.A. 254, 1362–69. The NITU provided a 180-day period for the Trails Fund and Indiana Southwestern to negotiate an interim trail-use agreement, through November 19, 2011. J.A. 1368–69. The Trails Fund obtained four extensions—all with the consent of Indiana Southwestern—through November 8, 2013. *Id.* at 254–55, 1075, 1370–73. While the NITU was pending, Indiana Southwestern executed a contract with A&K Materials, Inc. ("A&K"). Pursuant to that contract, A&K agreed to purchase and remove the rails on the rail line except those in rail crossings. *Memmer I*, 150 Fed. Cl. at 735, 748. It also agreed to move the ties from the center of the rail line. *Id.* A&K complied with the terms of the agreement and completed its work by early February of 2012.

The NITU deadline lapsed, and the NITU therefore expired, without the Trails Fund and Indiana Southwestern executing a trail-use agreement. Because the NITU extensions had lasted more than one year, under 49 C.F.R.

---

[5]    Our citation to Suppl. App. refers to the Supplemental Appendix filed as an addendum to the United States' Opening Brief.

§ 1152.29(e)(2), Indiana Southwestern then had 60 days—through January 7, 2014—to file a notice of consummation of abandonment of the rail line. It chose not to do so, however. *See* J.A. 1077, 1214, 1229.

Eventually, Indiana Southwestern submitted a new notice of exemption. In response, the STB published a notice in July of 2021, shortly after this appeal was filed. 86 Fed. Reg. 37,782 (July 16, 2021). The STB's notice stated that, absent third party intervention by July 26, 2021, the exemption would be effective, and thus Indiana Southwestern could abandon the line, on August 15, 2021. No potential trail sponsors came forward, and no NITU issued. Indiana Southwestern then filed a notice of consummation with the Board on August 31, 2021, meaning that the rail line was officially abandoned. As a result, Indiana Southwestern's easements terminated, and the landowners' fee simple interests became unencumbered by any easements.

## III

On January 9, 2015, the landowners filed their amended complaint, asserting that the issuance of the NITU on April 8, 2011, effected a permanent Fifth Amendment taking of their property. The landowners alleged that they each owned their property in fee simple; that Indiana Southwestern owned an easement across each of their properties; that their properties would no longer be burdened by that easement if the easement was abandoned or authorized for use beyond its scope; and that, but for the issuance of the NITU, they would own their land unencumbered by any easements. *Memmer I*, 150 Fed. Cl. at 716–17.

The parties each moved for summary judgment on liability. Relevant to this appeal, the parties disputed whether the issuance of the NITU effected a taking when a trail-use agreement was not executed, the NITU expired on its own terms, and Indiana Southwestern did not

consummate abandonment of its rail line during the period of the NITU. *Id.* at 717.

In an Opinion and Order issued July 10, 2015, the Court of Federal Claims held that the NITU effected a temporary categorical taking that spanned from May 23, 2011, the date the NITU went into effect, to November 8, 2013, the date the NITU expired.[6]  *Id.*  The parties ultimately reached a settlement on the amount due for the claims that survived summary judgment, and each appealed different facets of the court's Opinion and Order to this court.  *Id.* at 717–18.

While the case was on appeal, our court issued a predecessor decision to *Caquelin III*, *Caquelin v. United States*, 697 F. App'x 1016 (Fed. Cir. 2017) ("*Caquelin I*"). In that case, the government argued for the application of a multi-factor takings analysis pursuant to *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), and *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38–40 (2012), instead of a categorical takings analysis.  Our court's *Caquelin I* decision remanded for a decision by the Court of Federal Claims to create in that case "a fully developed record applying the multi-factor analysis the government urge[d]." *Caquelin I*, 697 F. App'x at 1020.  The parties in this case then jointly sought, and our court granted, a remand consistent with the ruling in *Caquelin I*.  *Memmer I*, 150 Fed. Cl. at 718. Subsequently, the Court of Federal Claims issued its decision on remand in *Caquelin*, *Caquelin v. United States*, 140 Fed. Cl. 564 ("*Caquelin II*"), setting forth the Court of

---

6    A categorical taking occurs when a regulation "compel[s a] property owner to suffer a physical invasion" or "denies all economically beneficial or productive use" of the property. *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1015 (1992) (internal quotation marks omitted).

Federal Claims' multi-factor analysis. *Id.* at 584. Our court then issued *Caquelin III*, which reaffirmed that a taking under the Trails Act is a categorical taking and clarified the applicable causation standard, as discussed above. 959 F.3d at 1367–73. *Caquelin III* issued before the issuance of the decision presently on appeal.

On remand in this case, the Court of Federal Claims allowed additional discovery and conducted a trial on liability and damages. With the benefit of the issuance of our *Caquelin III* decision before it, the court understood that it needed to analyze "whether the Board's issuance of the NITU caused the injury alleged by [the landowners]—a compelled continuation of Indiana Southwestern's easements that prevented [the landowners] from acquiring fee simple interests in the underlying land by operation of state law." *Memmer I*, 150 Fed. Cl. at 747. Before the Court of Federal Claims, the government argued that the landowners suffered no injury because they were in the same position they were in before Indiana Southwestern filed its notice of exemption. *Id.* The landowners contended that they were injured by the Board's issuance of the NITU—at least while the NITU was in effect—because a NITU automatically causes a taking under binding precedent. *Id.* at 747–48.

In its decision, the Court of Federal Claims determined that the landowners had established that Indiana Southwestern would have abandoned the rail lines in the absence of the NITU. *Id.* at 748. The court relied on the fact that Indiana Southwestern initiated the process for abandonment by filing a notice of exemption in which it represented that it had no local traffic move over its lines for at least the preceding two years and averred that it would consummate the abandonment of the lines "on or after January 15, 2011." *Id.* (quoting J.A. 1254). The court also relied on the fact that, during the pendency of the NITU, Indiana Southwestern engaged A&K to remove the rails on the line. *Id.* In addition, the court noted, counsel for Indiana

Southwestern testified that, even after the NITU expired, it was Indiana Southwestern's intent to either finalize the abandonment or execute a trail-use agreement. *Id.* at 748; *see* J.A. 1196–98, 1228–29. The court concluded:

> These facts reflect that Indiana Southwestern had every intent to abandon the railroad lines during the period of time that the NITU was in effect, and was prevented from doing so by the existence of the NITU. Further, the only evidence possibly suggesting that Indiana Southwestern might not have abandoned the lines between May 23, 2011, and November 8, 2013, is the fact that it did not file a notice of consummation within the sixty-day period following the expiration of the NITU, as legally required. However, what Indiana Southwestern chose to do (or not do) after the NITU expired is not particularly suggestive of what Indiana Southwestern was planning to do while the NITU was in place because such action (or inaction) might have been prompted by information learned or circumstances that arose after the NITU expired. And even if it was suggestive, it is outweighed by the evidence demonstrating Indiana Southwestern's intent to abandon the lines. Accordingly, the Board's issuance of the NITU injured plaintiffs by compelling the continuation of Indiana Southwestern's easements—despite Indiana Southwestern's expressed intent to abandon the lines—and preventing them from acquiring fee simple interests in the underlying land.

*Memmer I*, 150 Fed. Cl. at 748 (footnote omitted) (citing *Caquelin III*, 959 F.3d at 1370–71 (focusing on whether the railroad company would have abandoned its line "during the NITU" period)). The court noted that evidence indicating that the railroad continued to negotiate a trail-use agreement with the Trails Fund after the NITU expired

was irrelevant to whether it would have abandoned the rail lines during the pendency of the NITU. *Id.* at 748 n.41.

The Court of Federal Claims then examined the scope and duration of the taking. *Id.* at 750–52. The court rejected the landowners' argument that the taking was permanent. Instead, the court determined, the taking was temporary, lasting from the date the NITU became effective—May 23, 2011—through the deadline under 49 C.F.R. § 1152.29(e)(2) for Indiana Southwestern to file its notice of consummation of abandonment—January 7, 2014. *Id.* at 751–52.

Following its decision, the court denied the landowners' motion for reconsideration. *Memmer v. United States*, 153 Fed. Cl. 707 (May 20, 2021). After the parties then stipulated to damages and interest, the court entered final judgment on June 7, 2021. J.A. 77. Appellants timely appealed and the government timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

"We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Caquelin III*, 959 F.3d at 1366 (citing *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018)). "Whether a taking has occurred is a question of law based on factual underpinnings." *Id.* (citing *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)). Causation is a question of fact we review for clear error. *Hendler v. United States*, 175 F.3d 1374, 1378 (Fed. Cir. 1999).

II

We turn first to the government's cross-appeal, which challenges the Court of Federal Claims' conclusion that the issuance of the NITU in this case effected a taking. According to the government, "there is no change to the

landowners' property interests," and therefore no taking, "when a railroad requests abandonment authority from the Board and then [the railroad] chooses not to exercise that authority," as Indiana Southwestern did in this case. United States Opening Br. 33.

The government urges that our cases have found a taking to have occurred only where the NITU either (a) resulted in a trail-use agreement; or (b) compelled a delay in the railroad's abandonment of its line. *Id.* at 20–26, 30–36. "[W]hen a NITU expires with no change in the use of the rail corridor or in federal jurisdiction over the rail line," the government contends, it "cannot be said to have caused a change in the nature or effect of any easement." *Id.* at 33. The government also urges that in a situation "when the railroad does not abandon the line and easements do not terminate after the NITU period, no government action . . . can be said to have caused a delay," and therefore no temporary taking has occurred, because "[t]he government cannot delay something that does not happen." *Id.* at 34.

Relatedly, the government contends that the Court of Federal Claims erred when it held that the *Caquelin III* causation standard was met, i.e., that Indiana Southwestern would have abandoned the rail line if the NITU had not issued. *Id.* at 36–42. The government points to Indiana Southwestern's decisions to participate in negotiations with a potential trail sponsor and to extend the NITU and argues that these actions show the railroad's interest in pursuing a rail-trail as opposed to an interest in abandoning the rail corridor. *Id.* at 37–39. The government also points to Indiana Southwestern's decision not to consummate abandonment after the NITU expired, urging that it "should weigh heavily against the conclusion that the NITU caused a physical taking solely by preventing the railroad from abandoning the line during its pendency." *Id.* at 39. The government posits that, in this case, Indiana Southwestern "simply exercised its discretion—as it

always may—to not finish the regulatory process that it began." *Id.* at 20.

Appellants respond that "the evidence of causation in this case is substantial, overwhelming, and unrefuted and far exceeds the nature of the evidence that established causation in [*Caquelin III*]." Appellants' Resp. & Reply Br. 3; *see also id.* at 2–3, 4–9. Appellants argue that, in *Caquelin III*, our court considered, and found sufficient to determine that Ms. Caquelin had met her burden on the causation issue, evidence of the railroad's actions before the NITU ("the railroad filed an application to abandon, indicating an affirmative intent to abandon"); evidence of its actions during the NITU (the railroad "refused [to consent to an extension of the NITU], confirming an interest in abandoning sooner rather than later" and removed track during the NITU); and evidence of its actions after the NITU (the railroad "completed the abandonment just three months after . . . the date . . . it became legally authorized to abandon the line")). *Id.* at 11–12 (citing *Caquelin III*, 959 F.3d at 1372–73). Appellants also point out that the *Caquelin III* court considered that the railroad in that case fulfilled the standard of abandonment under state law. *Id.* at 12.

The evidence of causation in this case that Appellants point to is evidence that Indiana Southwestern intended to consummate abandonment when it submitted its notice of exemption before the NITU issued, evidence that the railroad removed the rails and ties during the pendency of the NITU (which, Appellants argue, established abandonment under Indiana state law), and evidence that the railroad still intended to either consummate abandonment or enter into a trail-use agreement when the NITU expired, and ultimately did formally consummate abandonment under federal law in 2021. *Id.* at 12–15 (citing J.A. 1216, 1221, 1228–29).

## III

To begin, we disagree with the government that a physical taking cannot occur when a NITU ends without either a trail-use agreement or the consummation of the railroad's abandonment. As we stated in *Caquelin III*:

> The NITU in this case, as in similar cases, was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion.

*Caquelin III*, 959 F.3d at 1367. Thus, once initiated, a NITU can effect a "mandated continuation" of an easement by the STB that "provid[es] a right of occupation by someone other than the landowner and . . . bar[s] the landowner from using the ground burdened by the easement." *Id.*; *see also Ladd*, 630 F.3d at 1025; *Caldwell*, 391 F.3d at 1234, 1236. This "mandated" or "compelled" continuation of an easement can occur regardless of whether the NITU ultimately leads to a trail-use agreement or the railroad's abandonment is ultimately consummated. That said, as we explained in *Caquelin III*, in order to determine if a NITU has effected a taking, we must consider whether the railroad would have abandoned the line, i.e., relinquished its rights to the rail right-of-way, during the period of the NITU had there been no NITU. 959 F.3d at 1372. That brings us to the matter of causation in this case. In that regard, we are not persuaded by the government's argument that the Court of Federal Claims erred in its causation analysis.

Significantly, the government does not argue that the court's findings of fact on causation are clearly erroneous. Oral Argument, 15:25–16:18 (June 6, 2022), https://oralarguments.cafc.uscourts.gov/default.aspx?fl=

21-2133_06062022.mp3.  What this means is that, in order for us to reverse the Court of Federal Claims on causation, we would have to conclude that the facts found by the court are insufficient support for the finding that "Indiana Southwestern had every intent to abandon the railroad lines during the period of time that the NITU was in effect, and was prevented from doing so by the existence of the NITU." *Memmer I*, 150 Fed. Cl. at 748; *see Caquelin III*, 959 F.3d at 1372–73 (rejecting the government's argument that the evidence was insufficient to support a finding of causation where there was no evidence indicating the railroad would have delayed abandonment had there been no NITU).  We are unable to reach that conclusion, however.

Since it does not challenge the Court of Federal Claims' findings of fact, the government relies heavily on evidence that Indiana Southwestern was interested in entering into a trail-use agreement as showing that the railroad did not intend to abandon the rail line during the NITU period.  We fail to see, though, how this evidence helps the government when, had a trail-use agreement been reached during the NITU, a taking of Appellants' property would have occurred.  *See Presault II*, 100 F.3d at 1550 (holding that the conversion of a rail line to a public trail was a taking of a new easement for which the landowners were entitled to compensation).  Moreover, the government does not point to any evidence indicating that Indiana Southwestern had changed its mind and wished to continue operating the rail line during the NITU period.  We therefore cannot say that the Court of Federal Claims erred in finding the evidence that Indiana Southwestern would have relinquished its rights to its right-of-way during the NITU period outweighed the evidence to the contrary.

IV

We turn next to the issue of when the temporary taking ended.  Appellants urge us to hold that the taking lasted until Indiana Southwestern consummated its

abandonment on August 31, 2021. Appellants' Br. 2, 5, 38–41, 44–52. This is so, Appellants contend, because the requirements for abandonment under Indiana law were satisfied upon the railroad's removal of the rails, yet Appellants' reversionary rights were still blocked until the railroad filed a notice of consummation of abandonment as required by 49 C.F.R. § 1152.29(e)(2). *Id.* at 41; Appellants' Resp. & Reply Br. 24–26.

For its part, the government contends that, if we agree with the Court of Federal Claims that a taking occurred, we nevertheless should hold that the court erred when it held that the taking ended on January 7, 2014, the conclusion of the 60-day period following expiration of the NITU. It was during that period that Indiana Southwestern could have filed a notice of consummation of abandonment had it chosen to do so. Instead, the government argues, the taking ended when the NITU expired on November 8, 2013, because after that date, the decision to fully abandon the rail line, and thus the continuation or non-continuation of the easement, was solely in the control of Indiana Southwestern. The government responds to Appellants' arguments regarding Indiana law by pointing out that the STB has exclusive and plenary jurisdiction over the abandonment of rail lines, and that abandonment under state law is preempted by federal law. United States Opening Br. 55–57; United States Resp. & Reply Br. 15–16; *see also* Appellants' Resp. & Reply Br. 20.

V

We agree with the government that the taking ended upon expiration of the NITU on November 8, 2013. This is so because it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of Indiana Southwestern. *Navajo Nation v. United States*, 631 F.3d 1268, 1274 (Fed. Cir.

2011) ("A takings claim must be predicated on actions undertaken by the United States . . . .").

For the same reason, we reject Appellants' argument that the taking lasted until August 31, 2021, when Indiana Southwestern finally filed its notice of consummation of abandonment pursuant to 49 C.F.R. § 1152.29(e)(2). Appellants claim that § 1152.29(e)(2) effected a taking because it allowed the railroad to fail to consummate abandonment after state law abandonment had already occurred. In other words, Appellants argue that, because § 1152.29(e)(2) requires the filing of a notice of consummation of abandonment, but does not mandate the filing of that notice as of the date state law abandonment requirements are met, the regulation had the effect in this case of extending Indiana Southwestern's easements and therefore the taking of Appellants' property, for an additional period.[7]    We reject this argument.    As Appellants acknowledge, "it is always the railroad's choice that ultimately impacts the duration of the taking."    Appellants' Resp. & Reply Br. 26.  Moreover, acceptance of Appellants'

---

[7]    Paragraph (e)(2) of 49 C.F.R. § 1152.29 states that a railroad that has received authority from the STB to abandon a rail line "shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network)."  49 C.F.R. § 1152.29(e)(2).  The regulation provides that, "assuming that the railroad intends to consummate the abandonment," the notice of consummation must be filed within one year of the service date of the decision permitting the abandonment unless at the conclusion of the one-year period a legal or regulatory barrier exists, in which case the notice of consummation must be filed no later than 60 days after the barrier is removed.  *Id.*

argument would effectively contradict the STB's plenary authority to regulate abandonment, which Congress granted over a hundred years ago in the Transportation Act of 1920, Pub. L. No. 66-162, 41 Stat. 456, 477–78 ("[N]o carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.").

## CONCLUSION

For the foregoing reasons, we hold that the Court of Federal Claims did not err in finding that Appellants suffered a temporary taking of their property. We hold that the court did err, however, in finding that the taking lasted until January 7, 2014. As explained, it lasted only until November 8, 2013. We therefore affirm the Court of Federal Claims' determination on liability, but we vacate its ultimate judgment as to compensation and interest. We remand the case to the court for a determination of the compensation and interest to which Appellants are entitled as a result of the taking of their property having ended on November 8, 2013, rather than on January 7, 2014.

## **AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

### Costs

No costs.